[No. H028813. Sixth Dist. Jan. 31, 2007.]

HUGH McALLISTER, Plaintiff and Appellant, v.
COUNTY OF MONTEREY et al., Defendants and Respondents;
SHELDON J. LAUBE et al., Real Parties in Interest and Respondents.

COUNSEL

Fenton & Keller, John S. Bridges, Mark A. Cameron, David C. Sweigert and Jennifer M. Pavlet for Plaintiff and Appellant.

Charles J. McKee, County Counsel, and Frank G. Tiesen, Deputy County Counsel, for Defendants and Respondents.

Lombardo & Gilles and Sheri L. Damon for Real Parties in Interest and Respondents.

OPINION

McADAMS, J.—This appeal represents the latest round in plaintiff's long battle against the approval of a coastal development permit on neighboring property. In administrative proceedings conducted by Monterey County officials and later by the California Coastal Commission, the real parties in interest won approval to construct a large single-family dwelling on the Big Sur Coast. In judicial proceedings below, real parties in interest and defendants successfully demurred to plaintiff's complaint, which was then dismissed. On appeal, plaintiff contends that the dismissal was improper procedurally, because the demurrer was unauthorized and untimely. He also argues that the dismissal was improper substantively because he has a valid cause of action against the county based on jurisdictional grounds and based on the county's violation of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).

As we explain, we find no merit in plaintiff's contentions. Procedurally, the trial court acted within its discretion in entertaining a second demurrer to plaintiff's complaint after the conclusion of Coastal Commission proceedings.

Substantively, there is no merit in plaintiff's jurisdictional claims that Monterey County's action was a legal nullity, since those allegations both conflict with judicially noticed documents and represent bare legal conclusions. Nor can plaintiff state a valid cause of action against the county under CEQA, because its determinations were superseded by the Coastal Commission's environmental review. Treating the trial court's order as a judgment of dismissal, we therefore affirm.

## BACKGROUND[1]

### The Parties

Appellant is Dr. Hugh McAllister (McAllister). McAllister chairs the World Wildlife Fund's marine leadership committee. He also owns property along the Big Sur Coast within view of the challenged project.

Respondents are the County of Monterey and the Monterey County Board of Supervisors (collectively, the County). The County passed the resolution challenged here, which approved the coastal development proposed by real parties in interest. Real parties in interest are Sheldon J. Laube and Dr. Nancy J. Engel (Laube & Engel or real parties in interest).

### The Proposed Development

In 2001, Laube & Engel sought permission to develop their property, which is located on Kasler Point, north of Rocky Point, at 36240 Highway 1, Big Sur. The property then consisted of two contiguous lots, each approximately two acres in size. Real parties in interests' proposal was for a large single-family home with a subterranean garage complex, measuring just over 10,000 square feet in all.

Many years before, the prior owner of the property, Donald Sorenson, had taken steps to build a house there. In 1977, the California Coastal Commission (Coastal Commission) granted Sorenson a development permit for a smaller home on the site, subject to certain conditions. One condition was that his

---

[1] Because this appeal followed a successful demurrer, the facts are drawn from the allegations of plaintiff's second amended complaint, the operative pleading. (See *Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 200 [33 Cal.Rptr.3d 617].) To the extent relevant, we also incorporate facts of which judicial notice has been taken. (Cf. *id.* at p. 203, fn. 2.)

two lots would be consolidated into a single parcel prior to the commencement of any grading or construction. Despite this condition, Sorenson began grading and construction without merging the two lots. After putting in a driveway, foundation, water connections, a septic system, and certain other improvements, Sorenson abandoned the project.

### The County's Coastal Ordinances

Monterey County has a local coastal plan (LCP), which is codified in chapter 20.90 of the Monterey County Code (Chapter 20.90). The LCP includes the Big Sur land use plan; it also includes a coastal implementation plan.

One pertinent provision of Chapter 20.90—a linchpin of McAllister's opposition to the project—provides that any permit, "if issued in conflict with the provisions of this title, shall be null and void." (Monterey County Code, § 20.90.010.) Another relevant provision of Chapter 20.90 prohibits the approval of permits "where there is an outstanding violation of this Title or the remaining portions of the Monterey County Coastal Implementation Plan involving the property upon which there is a pending application for such permit, . . . unless such permit . . . is the, or part of the, administrative remedy for the violation." (Monterey County Code, § 20.90.120.) That provision continues: "After recordation of a Notice of Violation by the enforcing officer, all departments, commissions, and public employees shall refuse to issue permits or licenses or entitlements involving the property except those necessary to abate the violation . . . ." (*Ibid.*) Chapter 20.90 authorizes the County's director of planning and building inspection to establish violations of the title. (Monterey County Code, § 20.90.20.) It also provides an array of alternatives for correcting violations. (See *id.,* §§ 20.90.060–20.90.090.) Among them are retroactive permits and restoration orders. (See *id.,* §§ 20.90.130, 20.90.140.)

### PROCEDURAL HISTORY

### Administrative Proceedings at the County

In early March 2001, Laube & Engel applied to the County for a development permit to construct a residence on their coastal property.

Later that same month, real parties in interests' application was reviewed for the first time by the Big Sur Land Use Advisory Committee. The advisory committee approved the project, on condition that no outside floodlighting would be used and that the invasive ice plant on the property would be eradicated. Thereafter, based on McAllister's objections and pursuant to his requests, real parties in interest relocated the proposed home. In March 2003, the committee reviewed the proposal as modified. Despite McAllister's continued opposition, the committee voted unanimously to approve the modified project as proposed, with an additional requirement that stone be used as the building material for the walls in order to minimize view impacts.

In October 2003, after a number of continuances, the project proceeded to the County's planning commission for a hearing. Over McAllister's opposition, the planning commission voted unanimously to approve both the proposed home and the parcel merger and to certify a mitigated negative declaration under CEQA.

In November 2003, McAllister filed an administrative appeal of the planning commission's decision, seeking review from the County's board of supervisors. In his appeal, McAllister asserted that the proposed project violated the 1977 coastal development permit obtained by real parties in interests' predecessor, that it conflicted with numerous policies in the local coastal program, that the planning commission's approval was based on misleading information, and that the project violated CEQA.

In January 2004, the board of supervisors conducted a public hearing on McAllister's appeal. Speakers at the hearing included real parties in interests' counsel; McAllister's counsel plus one witness; and the assigned land use planner for the County. The County's staff recommended denial of McAllister's appeal.

At the conclusion of the hearing, the board of supervisors unanimously adopted resolution No. 04-028, thereby denying McAllister's appeal. The resolution contains a number of findings, including this: "The subject property is in compliance with all rules and regulations pertaining to the use of the property; no violations exist on the property. . . ." In addition to denying McAllister's appeal, resolution No. 04-028 explicitly affirmed the mitigated negative declaration prepared for the project and specifically upheld the planning commission's earlier decision to approve the application by Laube & Engel for a combined coastal development permit.

The following month, McAllister appealed the County's decision to the Coastal Commission, "as a precautionary measure to protect [his] rights."

*Proceedings in the Trial Court*

On February 18, 2004, simultaneously with his appeal to the Coastal Commission, McAllister filed this action. In his combined petition for writ of mandate and complaint for declaratory and injunctive relief, McAllister asserted three causes of action. The first cause of action alleged an administrative mandamus claim against the County. (Code Civ. Proc., § 1094.5.) That cause of action incorporated these assertions: that the County's approval was null and void under its own code provisions and thus was made without jurisdiction; that the County failed to give McAllister a fair hearing; and that the County abused its discretion by not requiring an environmental impact report. McAllister's second cause of action, also against the County, sought a judicial declaration that the County's approval of the project was null and void. His third cause of action sought injunctive relief against the Coastal Commission, to prevent it from assuming jurisdiction over the project. In addition to the relief requested in the third cause of action of his complaint, McAllister also sought a temporary restraining order and preliminary injunction against the Coastal Commission, which the court denied.

In March 2004, Laube & Engel demurred to the complaint. As to the first cause of action, real parties in interest asserted, McAllister failed to exhaust his administrative remedies. Laube & Engel challenged the other two causes of action on the ground that the relief sought was improper. In the event that it declined to sustain the demurrer and dismiss the action, real parties in interest argued, the court should stay the litigation pending the outcome of the Coastal Commission appeal. The County joined real parties in interests' demurrer. The Coastal Commission separately demurred to the third cause of action against it. McAllister opposed the demurrers.

The court conducted a hearing on the demurrers in May 2004, taking them under submission. It issued a written ruling several days later, which included these provisions: (1) As to the first cause of action, the court stayed proceedings on McAllister's "claim under the California Environmental Quality Act . . . pending the Commission's final decision." (2) With respect to the second cause of action, the court sustained the demurrers of the County and real parties in interest, with leave to amend. (3) As to the third cause of action, the court sustained the Coastal Commission's demurrer, without leave to amend. Thereafter, in June 2004, the court issued a formal order concerning the demurrers, which reiterated the court's earlier rulings in all respects. In addition, it ordered dismissal of the action with prejudice as against the Coastal Commission and the entry of a separate judgment in the commission's favor.

*Coastal Commission Proceedings*

In September 2004, the Coastal Commission took the first substantive step in the administrative appeal, by concluding that the project in fact raised a substantial issue on various grounds and that it would therefore assume jurisdiction. (See Pub. Resources Code, § 30625, subd. (b)(1).)[2]

According to the Coastal Commission staff report, by then, "as a result of the appeal," Laube & Engel had modified the project. Under their revised plans as submitted, "the residence [was] relocated slightly north . . . , the base elevation of the northern portion of the house [was] lowered so that it is not visible within the critical viewshed, and the size of the residence [was] reduced" slightly.

After a de novo hearing in December 2004, the Coastal Commission granted Laube & Engel a coastal development permit, with conditions, for the modified project.

*Further Trial Court Proceedings*

In January 2005, Laube & Engel filed a second demurrer to the complaint, entitled "Notice of Motion of Demurrer and Motion to Dismiss." In it, Laube & Engel argued that McAllister's complaint failed to state a cause of action against the County, in that the Coastal Commission was the agency taking the final administrative action. As before, the County joined real parties in interests' demurrer. McAllister opposed the second demurrer on procedural and substantive grounds.

Following a hearing held in February 2005, the court sustained the second demurrer without leave to amend. The court issued a formal order several days later, in which (1) it found that McAllister "failed to state a cause of action," (2) it sustained the demurrer to the first cause of action, and (3) it ordered "the case dismissed in its entirety."

*Appeal*

McAllister brought this timely appeal.[3]

---

[2] Further unspecified statutory references are to the Public Resources Code.

[3] The record before us includes four volumes of clerk's transcript, three volumes of reporter's transcript, plus three volumes of administrative record, lodged with this court by McAllister. McAllister also requested this court to take judicial notice of certain documents contained in the clerk's transcript, being Monterey County Code provisions and Coastal Commission documents. We granted that request. In addition, Laube & Engel filed a request for judicial notice of five documents. Two of those documents relate to proceedings in this

## CONTENTIONS

On appeal, McAllister attacks the trial court's decision to sustain the second demurrer on three grounds. First, he asserts procedural deficiencies in the demurrer, including untimeliness. Second, McAllister argues, the demurrer lacks substantive merit, since his petition states a valid cause of action. Third, he contends, the trial court abused its discretion in sustaining the demurrer without leave to amend. Both the County and Laube & Engel refute those contentions.

## DISCUSSION

To establish the proper framework for our analysis of McAllister's contentions, we begin by describing the relevant statutes. Next, we summarize pertinent procedural principles, specifically the doctrine of exhaustion and the standards that govern appellate review of demurrers. Finally, against that backdrop, we address the specific issues presented in this appeal.

### STATUTORY FRAMEWORK: GENERAL PRINCIPLES

Two statutes have particular relevance here, CEQA and the California Coastal Act of 1976 (§ 30000 et seq.). Both are codified in the Public Resources Code.

### I. *CEQA*

CEQA appears at division 13 of the Public Resources Code, beginning with section 21000. As an aid to carrying out the statute, the state Resources Agency has issued a set of regulations, called Guidelines for Implementation of the California Environmental Quality Act (Guidelines).[4]

#### A. *Statutory Policy*

CEQA embodies our state's policy that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." (§ 21001, subd. (d); see *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106,

---

matter at the Coastal Commission; the others reflect proceedings in a separate superior court case involving the same parties. We likewise granted that request.

[4] The Guidelines are contained in the California Code of Regulations, title 14, division 6, chapter 3, starting at section 15000. Further unspecified guideline references are to those regulations.

112 [62 Cal.Rptr.2d 612].) As this court has observed, "the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326].) Together, the statute and accompanying regulatory guidelines protect a variety of environmental values. The "enjoyment of aesthetic, natural, [and] scenic . . . qualities" is among them. (§ 21001, subd. (b).) So, too, is the protection of wildlife and other species. (*Id.*, subd. (c).)

## B. *The CEQA Process*

■ Consistent with California's strong environmental policy, whenever the approval of a project is at issue, the statute and regulations "have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose, supra*, 54 Cal.App.4th at p. 112; see Guidelines, § 15002, subd. (k).)

### 1. *Threshold determination of CEQA's applicability*

"The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity. (Guidelines, §§ 15060, 15061.)" (*Davidon Homes v. City of San Jose, supra*, 54 Cal.App.4th at p. 112.)

CEQA applies if the activity is a "project" under the statutory definition, unless the project is exempt. (See §§ 21065, 21080.) "If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary." (*Davidon Homes v. City of San Jose, supra*, 54 Cal.App.4th p. 113.) "Only those projects having no significant effect on the environment are categorically exempt from CEQA review." (*Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1107 [23 Cal.Rptr.3d 321].) "Single-family homes are categorically exempt from CEQA, except (1) when they 'may impact on an environmental resource of . . . critical concern'; (2) 'when the cumulative impact of successive projects of the same type in the same place, over time is significant'; or 'where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.' " (*Id.* at p. 1106, quoting Guidelines, § 15300.2, subds. (a)–(c).)

■ If the project is not exempt—either because it does not fall within an exempt category or because an exception makes the exemption unavailable—then the agency must proceed to the second tier and conduct an initial study. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792 [124 Cal.Rptr.2d 731]; see Guidelines, § 15063.)

## 2. *Initial study*

The second tier of the process, the initial study, serves several purposes. One purpose is to inform the choice between a negative declaration and an environmental impact report (EIR). (Guidelines, § 15063, subd. (c)(1); *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180 [31 Cal.Rptr.3d 901].) Another purpose of the initial study is to eliminate unnecessary EIR's. (Guidelines, § 15063, subd. (c)(7).)

■ "CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389–390 [83 Cal.Rptr.2d 836], citing Guidelines, § 15070; see also § 21064; § 21080, subd. (c).) In certain situations where a straightforward negative declaration is not appropriate, the agency may permit use of a mitigated negative declaration. (See § 21064.5; Guidelines, § 15064, subd. (f)(2); *San Bernardino*, at p. 390.)

## 3. *Environmental impact report*

■ If the project does not qualify for a negative declaration, "the third step in the process is to prepare a full environmental impact report . . . ." (*Davidon Homes v. City of San Jose, supra*, 54 Cal.App.4th at p. 113, citing §§ 21100, 21151 & Guidelines, §§ 15063, subd. (b)(1), 15080.)

The California Supreme Court has "repeatedly recognized that the EIR is the 'heart of CEQA.'" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].) As the court observed more than three decades ago, "since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].) Other cases have since confirmed the statutory preference for resolving doubts in favor of an EIR. (See, e.g., *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 703 [7 Cal.Rptr.3d 868]; *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 905 [60 Cal.Rptr.2d 821].)

## II. *The California Coastal Act of 1976*

The California Coastal Act of 1976 (Coastal Act) is codified at Public Resources Code, section 30000 et seq. It replaced the California Coastal Zone Conservation Act, which had been enacted by initiative measure in 1972. (See Historical and Statutory Notes, 56B West's Ann. Pub. Resources Code (1996 ed.), foll. § 30000, p. 131.)

### A. *Statutory Policy*

The Coastal Act "was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 [205 Cal.Rptr. 801, 685 P.2d 1152]; see generally 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 90, pp. 312–314; *id.* (2003 supp.) pp. 230–234; Robie et al., Cal. Civil Practice: Environmental Litigation (2002) § 8:62, pp. 92–93; Curtin, Cal. Land Use and Planning Law (2006) ch. 9, pp. 232–236.)

In enacting the Coastal Act, the Legislature declared that "the basic goals of the state for the coastal zone are to: [¶] (a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources. [¶] (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners. [¶] (d) Assure priority for coastal-dependent and coastal-related development over other development on the coast. [¶] (e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone." (§ 30001.5.) Among other things, the "scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance." (§ 30251.)

### B. *Operation*

The Coastal Act "assigns chief responsibility for regulating the use and development of the 'coastal zone' . . . to [the] California Coastal Commission." (4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 90, p. 313, citation omitted.) The commission's "regulatory functions are coordinated with those of other state agencies having overlapping responsibilities."

(*Ibid.*) With respect to environmental responsibilities, under CEQA and its accompanying Guidelines, Coastal Commission environmental review may substitute for an EIR. (See § 21080.5, subds. (a), (e)(1); Guidelines, §§ 15002, subd. (*l*), 15251, subds. (c), (f).) Thus, the Coastal Commission's "permit appeal procedure is treated as the functional equivalent of the EIR process." (*Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569 [106 Cal.Rptr.2d 14].)

As for local governments, the Coastal Act sets " 'minimum standards and policies' for localities to follow in developing land use plans" but leaves " 'wide discretion to . . . local government . . . to determine the contents' of such plans . . . ." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 [38 Cal.Rptr.2d 699, 889 P.2d 1019], quoting *Yost v. Thomas, supra*, 36 Cal.3d at pp. 572–573; see also §§ 30004, subd. (a), 30005, subds. (a), (b).) The act thus contemplates "local discretion and autonomy in planning subject to review for conformity to statewide standards." (*Yost v. Thomas, supra*, 36 Cal.3d at p. 572.)

### 1. *The local coastal plan*

■ An LCP consists of a local government's land use plans, zoning ordinances, zoning district maps, and other implementing actions that satisfy the Coastal Act. (§ 30108.6.)

The LCP is submitted to the Coastal Commission for certification. (§ 30510, subd. (a); see generally Robie et al., Cal. Civil Practice: Environmental Litigation, *supra*, §§ 8:67–8:68, pp. 102–104.) In order to certify the LCP, the commission must find that it satisfies the requirements and policies set forth in chapter 3 of the Coastal Act. (§§ 30200, subd. (a), 30512, subd. (c), 30513; see *Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 871–872 [17 Cal.Rptr.3d 489]; Robie, *supra*, §§ 8:69–8:70, pp. 104–105.) Those "Chapter 3 policies" thus represent the standards for judging the adequacy of an LCP. (§ 30200, subd. (a); *Yost v. Thomas, supra*, 36 Cal.3d at p. 566; Robie, *supra*, § 8:71, pp. 105–106.) These policies are designed to protect certain identified resources, including recreation, sensitive habitat, and scenic resources. (See §§ 30223 [upland recreation], 30240 [environmentally sensitive habitat area], 30251 [visual and scenic resources].)

Once the Coastal Commission has certified the LCP "as conforming to the policies of the Coastal Act, review authority for development within that portion of the coastal zone passes to the local government." (*City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 804 [131 Cal.Rptr.2d 213].)

### 2. *Coastal development permits*

■ "Any person undertaking any development in the coastal zone, with certain limited exceptions, is required to obtain a coastal development permit. This is in addition to any other permit required from any state, regional or local agency." (Robie et al., Cal. Civil Practice: Environmental Litigation, *supra,* § 8:73, p. 106; see § 30600, subd. (a).) Development is broadly defined for these purposes. (Robie, *supra,* at pp. 106–107; see § 30106.) Thus, for example, a lot line adjustment may constitute a development requiring a coastal development permit (CDP). (*La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231, 239 [86 Cal.Rptr.2d 217].)

The Coastal Act's chapter 3 policies constitute the general standards for judging the permissibility of specific developments within the coastal zone. (§ 30200, subd. (a).) Furthermore, permits "issued for development between the nearest public road and the sea . . . must include a specific finding that the development is in conformity with the public access and public recreation policies of the Coastal Act." (Robie et al., Cal. Civil Practice—Environmental Litigation, *supra,* § 8:74, p. 107; see § 30604, subd. (c).)

### 3. *Coastal Commission appeals*

■ The Coastal Act provides for administrative appeals to the Coastal Commission in certain cases. (§ 30603.) "If . . . the local government approves an application for a CDP, its action may be appealed to the commission by the applicant, any aggrieved person, or any two members of the commission. [Citations.] The commission has limited jurisdiction to hear the appeal." (*City of Half Moon Bay v. Superior Court, supra,* 106 Cal.App.4th at p. 804.) As relevant here, the governing statute provides: "(a) After certification of its local coastal program, an action taken by a local government on a coastal development permit application may be appealed to the commission for only the following types of developments: [¶] (1) Developments approved by the local government between the sea and the first public road paralleling the sea or within 300 feet of the inland extent of any beach or of the mean high tideline of the sea where there is no beach, whichever is the greater distance." (§ 30603, subd. (a)(1).) The grounds for such an appeal are "limited to an allegation that the development does not conform to the standards set forth in the certified local coastal program or the public access policies set forth in this division." (*Id.,* subd. (b)(1) [referring to div. 20, the Coastal Act]; see *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569; see generally Robie et al., Cal. Civil Practice: Environmental Litigation, *supra,* § 8:76, pp. 112–113.)

■ "If an action is appealable, the commission must hear the appeal unless it determines no substantial issue exists with regard to the grounds for the appeal. (§ 30625, subd. (b)(2).)" (*City of Half Moon Bay v. Superior Court, supra,* 106 Cal.App.4th at p. 804.) The hearing must be set within 49 days. (§ 30621.) "This short time limit is 'designed to avoid unnecessary bureaucratic delay.'" (*Encinitas Country Day School, Inc. v. California Coastal Com.* (2003) 108 Cal.App.4th 575, 584 [133 Cal.Rptr.2d 551].) The Coastal Commission thus "is required, at a minimum, to make the determination whether a substantial issue exists, i.e., whether the appeal raises a substantial issue meriting an appellate hearing, within the 49-day limitation period." (*Id.* at p. 585.) "On appeal, the commission reviews the matter de novo, and may take additional evidence not received by the local government." (*City of Half Moon Bay,* at p. 804.) Thus, "in effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements." (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569.) The resulting decision " 'takes the place of and completely nullifies the former determination of the matter.' " (*Ibid.*)

## PROCEDURAL FRAMEWORK: GENERAL PRINCIPLES

In addition to the substantive statutes described above, this appeal also involves the application of other legal principles, which arise from procedural aspects of the case. One such principle is the doctrine of exhaustion of administrative remedies. Others relate to the procedural posture of this appeal, which follows the sustention of a demurrer.

### I. *Exhaustion*

■ Under the doctrine of administrative exhaustion, the long-standing general rule is this: "where an adequate administrative remedy is provided by statute, resort to that forum is a 'jurisdictional' prerequisite to judicial consideration of the claim." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 56 [109 Cal.Rptr.2d 14, 26 P.3d 343]; cf. *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 386 [6 Cal.Rptr.2d 487, 826 P.2d 730] [discussing the closely related doctrine of primary jurisdiction]; see generally 9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, §§ 108–109, pp. 1153–1155; Curtin, Cal. Land Use and Planning Law, *supra,* ch. 21, pp. 526–532.) Put another way: "In the context of administrative proceedings, a controversy is not ripe for adjudication until the administrative process is completed and the agency makes a final decision that results in a direct and immediate impact on the parties." (*Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara, supra,* 121 Cal.App.4th at

p. 875.) ▮ "The doctrine has been specifically applied to review of coastal commission actions." (*Walter H. Leimert Co. v. California Coastal Com.* (1983) 149 Cal.App.3d 222, 232 [196 Cal.Rptr. 739].)

## A. *Underpinnings*

▮ "The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary)." (*Farmers Ins. Exchange v. Superior Court, supra*, 2 Cal.4th at p. 391.) " 'Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor "because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency." ' " (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501 [87 Cal.Rptr.2d 702, 981 P.2d 543].)

The doctrine "is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942].) Until an available "administrative procedure has been invoked and completed, there is nothing that the . . . court may review; it cannot interfere in the intermediate stages of the proceeding." (*Id.* at p. 291.) For that reason, "the failure to exhaust administrative remedies prevents appellant from seeking relief through administrative mandamus (Code Civ. Proc., § 1094.5), which provides judicial review of *final* administrative proceedings." (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 619 [113 Cal.Rptr.2d 309].)

## B. *Exceptions*

▮ "There are exceptions to the exhaustion doctrine." (*Unnamed Physician v. Board of Trustees, supra*, 93 Cal.App.4th at p. 620.) Exceptions are commonly recognized when the administrative remedy is unavailable, when it is inadequate, or when it would be futile to pursue it. (*Ibid.*) Other exceptions include "situations where the agency indulges in unreasonable delay . . . , when the subject matter lies outside the administrative agency's jurisdiction, [or] when pursuit of an administrative remedy would result in irreparable harm . . . ." (*Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222 [239 Cal.Rptr. 470], citation omitted; accord, *Public Employment*

*Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1827 [17 Cal.Rptr.2d 323].) "To this list must be added exceptions where important questions of constitutional law or public policy governing agency authority are tendered." (*Public Employment Relations Bd.*, at p. 1827.)

### C. *Application to Questions of Law*

Notwithstanding the foregoing exceptions, exhaustion is not excused merely "because the ultimate legal issues . . . are better suited for determination by the courts." (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 169 [6 Cal.Rptr.2d 714].) For example, "constitutional challenges are frequently raised to the application of an administrative statutory scheme, yet the courts typically require such issues be presented to the administrative agency in the first instance." (*Ibid.*) As the California Supreme Court explained in another context, "the mere fact that the concept of vested rights is rooted in the Constitution does not deprive the [Coastal] Commission of the power to make the initial determination whether a developer qualifies for an exemption, so long as appropriate judicial review of the Commission's determination is provided." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 250 [115 Cal.Rptr. 497, 524 P.2d 1281]; accord, *South Coast Regional Com. v. Gordon* (1977) 18 Cal.3d 832, 834 [135 Cal.Rptr. 781, 558 P.2d 867]; *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 63 [227 Cal.Rptr. 667, 720 P.2d 15].)

### D. *Application to Questions of Agency Jurisdiction*

Generally speaking, even where questions concerning the agency's jurisdiction are presented, "the doctrine of exhaustion of administrative remedies requires judicial abstention until there has been a final decision in the administrative forum." (*Public Employment Relations Bd. v. Superior Court, supra*, 13 Cal.App.4th at p. 1828.) "One of the principal policy concerns of the exhaustion doctrine is judicial efficiency [citation], which cannot be served if the issue of statutory jurisdiction must be fully plumbed in order to determine whether it should be left to the agency in the *first* instance." (*Id.* at pp. 1831–1832.) As our state's high court put it long ago, "it lies within the power of the administrative agency to determine in the first instance, and before judicial relief may be obtained, whether a given controversy falls within the statutory grant of jurisdiction." (*United States v. Superior Court* (1941) 19 Cal.2d 189, 195 [120 P.2d 26].) However, as the court recognized in a later case, "these rules are inapplicable where . . . the agency is given no jurisdiction to make a judicial determination of the type involved." (*County of Alpine v. County of Tuolumne* (1958) 49 Cal.2d 787, 798 [322 P.2d 449].)

## II. *Demurrers: Appellate Review*

On appeal, "the plaintiff bears the burden of demonstrating that the trial court erred" in sustaining the demurrer. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879 [6 Cal.Rptr.2d 151].) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; accord, *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569]; see also, e.g., *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810 [27 Cal.Rptr.3d 661, 110 P.3d 914]; *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1024 [282 Cal.Rptr. 877].)

"As a general rule, if there is a reasonable possibility the defect in the complaint could be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459–460 [80 Cal.Rptr.2d 329]; see also, e.g., *Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at p. 810.) "Nevertheless, where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result." (*City of Atascadero,* at pp. 459–460.) In such cases, "we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790 [90 Cal.Rptr.2d 598].)

## ANALYSIS

Here, McAllister's appeal follows (1) an initial demurrer, interposed principally on the ground of failure to exhaust administrative remedies; (2) an administrative appeal to the Coastal Commission, which resulted in the approval of a modified project; and (3) a second demurrer, interposed principally on the ground of failure to state a cause of action, which the trial court sustained without leave to amend in February 2005.

On appeal, McAllister makes a three-pronged attack on the trial court's decision to sustain the second demurrer. First, he attacks the demurrer on procedural grounds, including untimeliness. Second, McAllister challenges the demurrer on substantive grounds, arguing that his petition states a valid cause of action on at least two theories. Third, McAllister contends that the trial court abused its discretion by not granting him leave to amend.

Before analyzing those specific contentions, we first discuss two threshold appellate issues: appealability and the scope of our review.

### I. Threshold Issues

#### A. Appealability

This appeal was taken from the trial court's February 2005 order sustaining the demurrer without leave to amend and ordering "the case dismissed in its entirety." The appellate record contains no judgment of dismissal, however.

Generally speaking, an order sustaining a demurrer "is neither appealable per se nor as a final judgment." (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920 [167 Cal.Rptr. 831, 616 P.2d 813].) But "an appellate court may deem an order sustaining a demurrer to incorporate a judgment of dismissal." (*Ibid.*) Furthermore, an "order dismissing a complaint with prejudice constitutes an appealable judgment . . . . (See Code Civ. Proc., §§ 581d, 904.1, subd. (a)(1).)" (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 867, fn. 3 [13 Cal.Rptr.3d 420].)

In this case, the matter is fully briefed and no party has raised an objection to consideration of the appeal on its merits. To the contrary, the County points out that "all parties have treated the subject Order as the final act of the Trial Court and therefore appealable." Under these circumstances, it is appropriate to treat the February 2005 order as an appealable judgment of dismissal. "In the interest of justice and to prevent further delay, we will deem the order sustaining defendant's demurrer to incorporate a judgment of dismissal and thus interpret plaintiffs' notice of appeal as applying to such dismissal." (*Bellah v. Greenson* (1978) 81 Cal.App.3d 614, 618, fn. 1 [146 Cal.Rptr. 535].)

#### B. Scope of Review

This appeal involves only the first cause of action of McAllister's complaint, for administrative mandamus. Two of the claims asserted there are presented in this appeal: first, that the County's action was null and void, which divested it of jurisdiction, and second, that the County violated CEQA. In addition to those two claims, the first cause of action also alleges that the County denied McAllister a fair hearing, and that the County failed to comply with various substantive provisions of its LCP. But those latter contentions are deemed abandoned for lack of appellate argument. (See, e.g., *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237–238 [118 Cal.Rptr.2d 313].)

We are not concerned here with the second cause of action of McAllister's complaint, which sought declaratory relief against the County, or with the third cause of action, which sought injunctive relief against the Coastal Commission. As McAllister offers no argument concerning either cause of action, we treat both as abandoned. (*Schoendorf v. U.D. Registry, Inc., supra,* 97 Cal.App.4th at pp. 237–238.) Moreover, as to the third cause of action, the trial court ordered judgment in the commission's favor in June 2004. That action is not part of this appeal, which challenges only the court's later order of February 2005.

## II. *Propriety of the Challenged Ruling*

We turn now to McAllister's first avenue of attack on the challenged portion of the trial court's order, which rests on his claim of procedural defects. As we explain, we find no merit in that claim.

### A. *The Trial Court Did Not Err in Rejecting McAllister's Procedural Challenges to the Second Demurrer*

McAllister argues that the demurrer was not timely and that it was not an authorized pleading. Like the trial court, we reject those procedural challenges.[5]

#### 1. *Timeliness*

The second demurrer was filed by Laube & Engel on January 18, 2005, and joined by the County the same day. By McAllister's reckoning, not only does that date fall some 11 months after service of the initial complaint, but it was 40 days after completion of the Coastal Commission proceedings, an event that operated to lift the May 2004 stay. Under either timeframe, he claims, the second demurrer was filed too late. McAllister states that a demurrer *must* be filed and served within 30 days after service of the complaint, citing several statutes, including Code of Civil Procedure section 430.40.

Despite McAllister's insistence to the contrary, we are not persuaded that the challenged demurrer was untimely.

---

[5] As our analysis demonstrates, we do not adopt real parties in interests' approach to this issue, which suggests viewing the second demurrer "as simply a reassertion of the original demurrer," or analogizing it to "other procedural avenues to test the sufficiency of the pleadings . . ."

At the outset, we disagree with McAllister's characterization of section 430.40 of the Code of Civil Procedure as mandatory. That statute reads in relevant part: "A person against whom a complaint or cross-complaint has been filed *may*, within 30 days after service of the complaint or cross-complaint, demur to the complaint or cross-complaint." (Code Civ. Proc., § 430.40, italics added.) The cited provision thus uses the permissive expression "may," not the mandatory term "must." (Cf. *Garrison v. Rourke* (1948) 32 Cal.2d 430, 435–436 [196 P.2d 884] ["time limitation for the court's action in a matter subject to its determination is not mandatory (regardless of the mandatory nature of the language), unless a consequence or penalty is provided for failure to do the act within the time commanded"], overruled on another ground in *Keane v. Smith* (1971) 4 Cal.3d. 932, 939 [95 Cal.Rptr. 197, 485 P.2d 261].)

Furthermore, the quoted provision nominally applies only to a first round of demurrers. As one commentator observes: "No statute or rule specifically provides a time limit for demurring to an *amended* complaint." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 7:139, p. 7-53.) In a similar vein, we are aware of no statute or rule that specifically governs situations such as that presented here, where no amended pleading is filed after dissolution of a stay.

Moreover, it is not clear precisely when the May 2004 stay was lifted, a point that was disputed below. The record contains no order explicitly lifting the stay or otherwise setting a specific time for further pleading. (Cf. Code Civ. Proc., § 472b ["When a demurrer to any pleading is sustained or overruled, and time to amend or answer is given, the time so given runs from the service of notice of the decision or order, unless the notice is waived in open court, and the waiver entered in the minutes"].)

The stay order itself contemplates an amendment of the complaint following completion of the Coastal Commission proceedings, followed by a response, at which point the stay would lift.[6] Of course, that did not happen here, since McAllister never amended his original complaint.

---

[6] With respect to the stay, the court's June 2004 formal order provides as follows: "The first cause of action is stayed in all respects from May 10, 2004, including but not limited to, the Real Parties in Interest's and Respondent's response to any amended petition and/or complaint which may be filed by Petitioners, pending the Coastal Commission's final decision on the merits of the pending appeals to the Commission of the County's approval of Real Parties' project which is the subject of this litigation or, pending the Coastal Commission's determination that said appeals do not raise a substantial issue with respect to the grounds on which an appeal has been filed pursuant to . . . section 30603."

The May 2004 stay order further provides that the judicial proceedings would remain stayed "pending the Coastal Commission's final decision on the merits." But the order does not incorporate a mechanism for determining the date of that event's occurrence. And the record reflects a factual dispute on that point. According to McAllister's argument below, the stay lifted on December 9, 2004, when the Coastal Commission took action on the appeal. But Laube & Engel took a different view in the trial court. First, they raised questions about the finality of the administrative proceedings, noting that the Coastal Commission had not adopted its revised findings. Furthermore, they argued, their demurrer was filed within 30 days of notification to the trial court of the Coastal Commission's action. Finally, real parties in interest urged, they were entitled to further time to respond, since the administrative record was being augmented and thus was not complete. (See Code Civ. Proc., § 1089.5.) To the extent that the trial court resolved these factual issues adversely to McAllister, we defer to its decision on that point. (See, e.g., *Jones v. Moers* (1928) 91 Cal.App. 65, 68 [266 P. 821].)

 Finally, as McAllister acknowledges, the parties to an action may stipulate to an extension of time to respond. (Code Civ. Proc., § 1054, subd. (b).) In this case, by letter addressed to real parties in interests' counsel, McAllister's attorneys confirmed their earlier offer "to extend the date within which the answers must be served and filed to January 10, 2005. [Deputy County Counsel] Mr. Iglesia thereafter requested an additional one-week extension, which we granted, and Mr. Iglesia has advised us that he will be filing the County's answer to the Petition by January 18, 2005. We are willing to provide your client with the same additional extension, if you so request." Notwithstanding McAllister's insistence that "answer" does not mean "demurrer," a contrary interpretation would not be unreasonable. (Cf. Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 7:34.1, p. 7-16 ["word 'answer' in § 471.5 presumably means 'respond' and thus includes the possibility for another demurrer"].) That point represents a factual dispute concerning McAllister's "alleged promise to extend [defendant's] time to answer" and "the trial court necessarily passed upon this question adversely to [McAllister]. Under such circumstances the decision is controlling." (*Jones v. Moers, supra,* 91 Cal.App. at p. 68.)

For all these reasons, we conclude, the trial court was warranted in treating the second demurrer as timely.

 Even assuming for argument's sake that the demurrer was filed late, the trial court nevertheless had discretion to entertain it. "There is no absolute right to have a pleading stricken for lack of timeliness in filing where no question of jurisdiction is involved, and where, as here, the late filing was a mere irregularity [citation]; the granting or denial of the motion is a matter

which lies within the discretion of the court." (*Tuck v. Thuesen* (1970) 10 Cal.App.3d 193, 196 [88 Cal.Rptr. 759], disapproved on another ground in *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190, fn. 29 [98 Cal.Rptr. 837, 491 P.2d 421]; cf. *Johnson v. Sun Realty Co.* (1934) 138 Cal.App. 296, 299 [32 P.2d 393] [court had discretion to hear a demurrer, notwithstanding violation of procedural rules].)

■ As provided by statute: "The court may, in furtherance of justice, and on any terms as may be proper, . . . enlarge the time for answer or demurrer." (Code Civ. Proc., § 473, subd. (a)(1).) The trial court may exercise this discretion so long as its action does "not affect the substantial rights of the parties." (*Harlan v. Department of Transportation* (2005) 132 Cal.App.4th 868, 873 [33 Cal.Rptr.3d 912] [affirming trial court's decision to permit plaintiff to file late amendment following demurrer]; see Code Civ. Proc., § 475.)

Here, we conclude, the trial court's decision to entertain the second demurrer did not affect McAllister's substantial rights. "Prior to the filing of respondent's demurrer to the amended complaint, appellant had not taken any steps to have judgment by default entered under Code of Civil Procedure section 432, nor did he endeavor to show that he was in any way prejudiced by the delay." (*Tuck v. Thuesen, supra,* 10 Cal.App.3d at p. 196.) The same is true in this case. The trial court thus acted within its broad discretion in allowing respondents to file the second demurrer, notwithstanding McAllister's protestations that it was untimely.

### 2. *Propriety*

Apart from its timeliness, McAllister also challenges the validity of using a demurrer in these circumstances. As he puts it: "No legal authority allows Real Parties or the County to file the Second Demurrer in the absence of an amended pleading having first been filed by Dr. McAllister." Characterizing the demurrer as "procedurally improper" for that reason, McAllister argues that he was "clearly prejudiced by such error, which resulted in the dismissal of his Complaint in its entirety, thereby depriving him of an opportunity to seek judicial review of the County's violations of CEQA, including the failure to prepare an EIR for the Project, and judicial enforcement of Chapter 20.90 as to the County."

■ We reject McAllister's claim of error. While it is true that no statute specifically authorizes the procedure undertaken here, neither does any statute forbid it. "Courts, of course, also have ' "inherent supervisory and administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority." . . . ' . . . The inherent powers may be exercised

only if the procedure or practice of the court is not in conflict with a specified statutory procedure." (*Motion Picture & Television Fund Hospital v. Superior Court* (2001) 88 Cal.App.4th 488, 492 [105 Cal.Rptr.2d 872], citations omitted.)

■ Significantly, the pleading at issue here is a general demurrer, which attacks the fundamental validity of the cause of action—a challenge that may be raised at any time. "The objection that a complaint does not state facts sufficient to constitute a cause of action may be raised at any stage of the proceedings and, even for the first time upon appeal." (*Horacek v. Smith* (1948) 33 Cal.2d 186, 191 [199 P.2d 929]; see Code Civ. Proc., § 430.40, subd. (b).) For these reasons, we are not persuaded that the procedure used in this case was improper.

■ Even assuming that the trial court erred in allowing the second demurrer in these circumstances, it nevertheless is bound to ignore any "defect . . . in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties." (Code Civ. Proc., § 475.) In our view, the trial court's decision to consider the second demurrer did not prejudice McAllister by affecting his substantial rights. McAllister's contention that the perceived irregularity caused the dismissal of his complaint and the attendant loss of his right to judicial review of his claims against the County misses the point. Those claims were not lost because of the procedures employed; rather, they were rejected because they lack substantive merit, a point we now address.

### B. *McAllister Did Not State a Cause of Action Based on Voidness*

In McAllister's view, the trial court erred in dismissing his petition since it states a valid cause of action on two theories, the first being that the County's action was void *ab initio*. As we explain, we reject McAllister's voidness theory. Our analysis of this question proceeds in two separate steps: (1) a discussion of the exhaustion requirement in the context of this claim, and (2) an assessment of whether McAllister has stated a cause of action.

#### 1. *McAllister's claim that the County's action was null and void does not excuse the exhaustion requirement.*

We begin with an analysis of the administrative exhaustion doctrine as it relates to McAllister's voidness claim. We do so in light of the allegation in McAllister's complaint that he was "relieved of and exempt from any exhaustion of administrative remedies by virtue of the lack of jurisdiction of the County to approve the Project based on . . . Chapter 20.90 . . . and the existing violation of the Project Site of Condition 3 of the 1977 Permit." As

noted above, exhaustion was primarily at issue in the first demurrer, which was interposed before the matter proceeded to the Coastal Commission. Nevertheless, the parties continued to dispute the exhaustion requirement in connection with the second demurrer. Real parties in interest thus argued: "The only final administrative decision on the issuance of a Coastal Development Permit . . . is the one which the Coastal Commission made on December 9, 2004. . . . [¶] Accordingly, Petitioner failed to state facts sufficient to constitute a cause of action. . . ." In response, McAllister reiterated that his "central argument is that the County's action in proceeding on the Project application was illegal under Chapter 20.90 and therefore not one that legally could be appealed to the Coastal Commission." Arguing against the "strict finality requirement" urged by real parties in interest, McAllister contended "that the County remains an appropriate party" under "the exception to the exhaustion doctrine" that is applicable "where the action challenges the very jurisdiction of an administrative agency to consider the matter."

McAllister continues to press his exhaustion arguments on appeal. He contends: "Chapter 20.90 and its declaration that permits issued in conflict with the provisions of Title 20 of the LCP 'shall be null and void' changes the analysis ordinarily applicable in the context of a claim of failure to exhaust administrative remedies." He adds: "Central to Dr. McAllister's Complaint is the allegation that the County's action was a legal nullity and therefore there was no valid final County action from which an appeal to the Coastal Commission could be properly taken."

The County and real parties in interest refute McAllister's contentions, though each takes a different analytic path.[7] As we now explain, our own assessment in this first step in the analysis leads us to the same conclusion: McAllister is mistaken, and exhaustion was required.

### a. *Exhaustion of all available remedies is generally required.*

As discussed above, exhaustion of administrative remedies is generally required before resort to judicial remedies. (*Styne v. Stevens, supra,* 26 Cal.4th at p. 56.) "The petitioner . . . must obtain a final decision on the merits at the highest available administrative level before seeking judicial

---

[7] While the County discusses the question in terms of exhaustion, Laube & Engel frame the issue as one of finality. As they see it, McAllister cannot challenge the County's action because that action was never final—a prerequisite for administrative mandamus—since an appeal was taken to the Coastal Commission. (See Code Civ. Proc., § 1094.5.) "The purpose of section 1094.5 is to inquire into the validity of any *final* administrative order." (*State of California v. Superior Court, supra,* 12 Cal.3d at p. 245.) That does not occur "until the administrative process is completed and the agency makes a final decision that results in a direct and immediate impact on the parties." (*Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara, supra,* 121 Cal.App.4th at p. 875.)

review. If an appeal can be taken to a higher administrative body . . . that appeal must be pursued and the issues must be presented to the final decisionmaker before they can be presented in court." (Curtin, Cal. Land Use and Planning Law, *supra*, ch. 21, p. 528.) Where an administrative appeal is available but "no appeal is taken, there is a failure to exhaust administrative remedies, and mandamus will not lie." (*Grant v. Superior Court* (1978) 80 Cal.App.3d 606, 609 [145 Cal.Rptr. 699].)

### b. *Exhaustion is required even though voidness is asserted.*

Even where an ordinance is challenged on the ground that it is void as applied to a particular property, the challenger generally must first exhaust all available administrative remedies before asserting his claim in court. Our high court endorsed that principle more than 60 years ago in the *Metcalf* case. (*Metcalf v. County of Los Angeles* (1944) 24 Cal.2d 267, 270–273 [148 P.2d 645].) In *Metcalf*, the court squarely rejected an argument by the plaintiffs "that the doctrine of exhaustion of administrative remedies does not require them to follow the procedure prescribed by an ordinance which they allege is void as to their property." (*Id.* at p. 270; accord, *Pan Pacific Properties, Inc. v. County of Santa Cruz* (1978) 81 Cal.App.3d 244, 249 [146 Cal.Rptr. 428]; see also *United States v. Superior Court, supra,* 19 Cal.2d at pp. 194–195.)

Applying *Metcalf* to the circumstances presented here, McAllister was required to apply for all available administrative relief—including appeal to the Coastal Commission—notwithstanding his claim that the County's action was a nullity.

We find no basis for a contrary result in the Supreme Court's later decision in *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d 787. In that case, the dispute concerned Alpine County's geographic boundaries, which were described in ambiguous statutory language. (*Id.* at p. 791.) The high court concluded that the courts—not the agency—had primary jurisdiction to interpret the legislative language. (*Id.* at pp. 792, 798.) As the court observed: "An administrative agency can act only as to those matters which are within the scope of the powers delegated to it." (*Id.* at p. 797.) Furthermore, the court stated, the rules requiring exhaustion "are inapplicable where, as here, the agency is given no jurisdiction to make a judicial determination of the type involved." (*Id.* at p. 798.)

The situation described in *Alpine* does not apply to our case. In this case, unlike that one, the agency had fundamental and primary jurisdiction over the parties' dispute. That conclusion proceeds manifestly from the relevant statutes, which recognize the Coastal Commission's authority to make determinations of the type involved here.

■ By statute, the Coastal Commission's jurisdiction extends to "any permit action, . . . appeal, . . . or any other quasi-judicial matter requiring commission action, for which an application has been submitted to the commission." (§ 30321; see *Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 190 [80 Cal.Rptr.2d 562].) With respect to appeals, under the Coastal Act, "an action taken by a local government on a coastal development permit application may be appealed to the commission for . . . [¶] . . . [d]evelopments . . . approved by the local government between the sea and the first public road paralleling the sea . . . ." (§ 30603, subd. (a)(1).) The Coastal Act thus incorporates a "chain of responsibility" for considering coastal developments such as that challenged here. (*REA Enterprises v. California Coastal Zone Conservation Com.* (1975) 52 Cal.App.3d 596, 605 [125 Cal.Rptr. 201] [construing the former administrative scheme, which gave regional commissions, rather than local governments, the authority "to adjudicate the propriety of granting or denying a permit" in the first instance, followed by an appeal to the state commission which "takes a new, unlimited look at the same request for a permit by a de novo public hearing"]; see also, e.g., *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at pp. 569–570.) For such projects, the County makes the initial decision on the CDP, and the Coastal Commission hears any appeal.

The Coastal Commission's appellate jurisdiction is limited to determining whether the development conforms "to the standards set forth in the certified local coastal program or the public access policies set forth in this division." (§ 30603, subd. (b)(1); see *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569.) The County's local coastal program standards—previously certified by the Coastal Commission—include those set forth in Chapter 20.90. By logical inference, it is within the Coastal Commission's appellate jurisdiction to review the County's action vis-à-vis those standards—including an assessment of the underlying validity of the local government action. That very question was before the Coastal Commission here.[8] In undertaking to answer it, the Coastal Commission was acting

[8] The Coastal Commission's August 2004 appeal staff report-substantial issue determination is part of the record, as the result of McAllister's request for judicial notice below and in this court. In a summary of the contentions raised in the Coastal Commission appeal, the report states: "The County's approval of this application presents a number of unresolved jurisdictional and procedural issues." As described in the report, they included (a) what effect the work done by Sorenson in violation of the 1977 permit would have on "the proper procedure that the Coastal Commission should follow in considering this item"; (b) whether "the current plans approved by the County would . . . be consistent with the CDP issued by the Coastal Commission and would violate the terms of approval that were adopted in 1977"; and (c) whether "pending grading and construction violations [exist] that, under the County's LCP procedural rules, should have precluded action on the application."

In its recommended findings and declarations, the August 2004 Coastal Commission staff report continues: "With regards to the procedural issues, the Coastal Commission granted an

"within the scope of the powers delegated to it." (*County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 797.)

The recognition of this authority on the Coastal Commission's part is consistent with the policy reasons that underpin the exhaustion requirement. As has been said, where litigants fail to proceed with available administrative remedies, they "have in effect deprived the [agency] of an opportunity to correct the alleged constitutional infirmity." (*Pan Pacific Properties, Inc., v. County of Santa Cruz, supra,* 81 Cal.App.3d at p. 249; cf. *Sierra Club v. San Joaquin Local Agency Formation Com., supra,* 21 Cal.4th at p. 502.) In this case, the agency charged with correcting the asserted defect (the Coastal Commission) is not the same one that took the challenged action (the County). But in our view, that circumstance is irrelevant, given the chain of responsibility established by the Coastal Act. Where the claimed deficiency can be corrected administratively—including via appeal to another agency—the beneficial purposes of the exhaustion doctrine are advanced. "The doctrine's purpose is fully served when parties raise all issues before the administrative body with *ultimate or final responsibility* to approve or disapprove the project . . . ." (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 594 [96 Cal.Rptr.2d 880], italics added.) In this case, that body is the Coastal Commission. (See *Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569.)

To sum up, in cases where "the subject matter lies outside the administrative agency's jurisdiction," the exhaustion requirement is excused. (*Green v. City of Oceanside, supra,* 194 Cal.App.3d at p. 222; see *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 798.) This is not such a case, however. Here, by express legislative grant, the Coastal Commission had

---

earlier permit for a single family dwelling in 1977 to Sorenson (Permit # A-174-77). . . . [¶] During review of this current proposal, Commission staff recommended to the County staff that the applicants['] request for a new residence should be considered an amendment to the original 1977 Sorenson CCC permit, based on staff's belief that the original permittee had exercised the permit, as evidenced by partial development on site. . . . However, it has since been determined that Sorenson never combined the two lots as required by the Commission's permit, and so the work done was in violation of permit conditions. . . . Work done in violation of permit conditions is illegal and cannot be used to assert that the permit has been exercised. Since no extension of the 1977 permit occurred (or was requested) the Sorenson CDP appears to have expired in 1979. Eventually, the property was sold to Laube/Engel . . . whose application for development in the same general building site is the subject of this appeal. [¶] . . . Since Commission approval of the Sorenson project was granted for a period of two years, and permit conditions were never fully complied with during that time, the permit appears to have expired, and the development on the site is a violation. The County now has a certified LCP, and as such has been granted the authority to regulate development in the coastal zone, with the Commission retaining appeal jurisdiction in the Big Sur Coast. Thus the Commission finds that the County was correct to have processed a coastal development permit application for the project. As a result of carrying out their permit authority, the County has approved a project, which has been appealed to the Commission."

fundamental subject matter jurisdiction to decide the administrative appeal of real parties in interests' CDP. (§ 30603, subd. (a)(1).) McAllister's claim that the County's action is null and void does not operate to excuse the exhaustion requirement in these circumstances. (*Metcalf v. County of Los Angeles, supra*, 24 Cal.2d at p. 271.)

c. *Cognizable jurisdictional claims will not escape review.*

██ Contrary to McAllister's dire assertions, the exhaustion requirement does not place reviewable administrative decisions *"forever beyond judicial scrutiny."* It is well established that an administrative agency "may constitutionally hold hearings, determine facts, apply the law, and impose certain types of monetary relief so long as (i) these activities are 'authorized by statute or legislation and are *reasonably necessary* to effectuate the administrative agency's *primary, legitimate regulatory purposes*, and (ii) the *"essential" judicial power* (i.e., the power to make enforceable, binding judgments) *remains ultimately in the courts, through review of agency determinations.'* " (*Bradshaw v. Park* (1994) 29 Cal.App.4th 1267, 1275 [34 Cal.Rptr.2d 872], quoting *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 372 [261 Cal.Rptr. 318, 777 P.2d 91]; see also, e.g., *State of California v. Superior Court, supra*, 12 Cal.3d at p. 250; *Halaco Engineering Co. v. South Central Coast Regional Com., supra*, 42 Cal.3d at p. 63.)

Judicial review thus remains obtainable—once available administrative remedies have been exhausted—for any claims that survive that process. (*Grant v. Superior Court, supra*, 80 Cal.App.3d at p. 609; § 30801; cf. § 30802 [judicial review where there is no right of appeal to the Coastal Commission].) For example, as the Supreme Court observed in *Metcalf*, had the plaintiffs there exhausted the administrative process available to them, "they would not have been barred from asserting in appropriate judicial proceedings that the zoning ordinance was unconstitutional as to their property." (*Metcalf v. County of Los Angeles, supra*, 24 Cal.2d at p. 272.) The same is true here. To the extent that McAllister's claims retained vitality following the Coastal Commission proceedings (a point we discuss below), they were subject to judicial review in his mandamus action in the superior court.

Having concluded that McAllister's voidness claim did not operate to excuse him from exhausting available administrative remedies, including an appeal to the Coastal Commission, we now proceed to the remaining step in our analysis of this theory of the complaint: an assessment of whether McAllister has stated a cause of action on voidness grounds. The second demurrer not only challenged the allegations in McAllister's complaint that he was excused from exhausting administrative remedies, it also attacked the very existence of a cause of action based on voidness. In this second part of

the analysis, we therefore consider the sufficiency of McAllister's allegations that the County's action was void *ab initio* as a discrete issue, distinct from the question of finality.

2. *Liberally construed, McAllister's pleading does not state a claim that the County's action is void* ab initio.

As McAllister puts it, if he "can allege any facts under which the provisions of Chapter 20.90 would prohibit County consideration and approval of the Project or under which those provisions would mandate a conclusion that the County's approval of the Project is 'null and void,' then the granting of the Second Demurrer without leave to amend must be reversed." That is an accurate recitation of the general *legal* principle concerning demurrers. McAllister's petition presents no *factual* basis for relief, however.

Under the governing legal principles, "we take as true the well-pleaded factual allegations of the complaint." (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 193 [126 Cal.Rptr.2d 908, 57 P.3d 372].) We construe the "complaint liberally to attain substantial justice among the parties." (*Long Beach Equities, Inc. v. County of Ventura, supra*, 231 Cal.App.3d at p. 1024.) Nevertheless, we "may not consider conclusions of fact or law, opinions, speculation or allegations which are contrary either to law or to judicially noticed facts." (*Ibid.*) We thus disregard any allegations of McAllister's complaint that conflict with judicially noticed documents as well as those that represent bare legal conclusions.

In a succinct summary of his position on this point, McAllister asserts that he "has stated a cause of action [a] that the County's consideration of the Project violated Chapter 20.90, [b] that its approval of the Project was 'null and void,' and [c] that therefore both the County and the Coastal Commission were without jurisdiction to take any action on the Project." Each of those three points follows in logical progression, with the last one depending on the first two. We examine each in turn.

a. *Violation of Chapter 20.90*

McAllister starts with the assertion that the County's consideration of the project violated Chapter 20.90, which embodies part of the County's LCP. That assertion relies on these two factual allegations: (1) that real parties in interests' predecessor, Sorenson, did grading and construction work on the property that violated condition 3 of the 1977 Coastal Commission permit since the two lots had not yet been merged; and (2) that the "said grading and construction work was illegal and constituted a violation of permit conditions under Chapter 20.90. . . ."

We accept as true the first factual allegation summarized above—that Sorenson's grading and construction work was done in violation of his 1977 CDP. Indeed, there appears to be no dispute as to that fact.

As to the second premise, however, we conclude that it conflicts with judicially noticed documents, which show that there was no record of any violation of Chapter 20.90, as distinguished from violations of the 1977 permit.

The documents before us include both a transcript of the January 2004 hearing by the County's board of supervisors and the resolution passed at the close of that hearing. As reflected in the transcript, the County's assigned planner said this: "As far as our County records, there is no recorded violation at the site. We did turn it over to the Coastal Commission staff to investigate. We have heard nothing from them yet. But we hopefully, will treat [sic] that this project will correct any violation that there may be by making that site useable." Similarly, in a section devoted to findings supporting denial of the appeal, resolution No. 04-428 notes McAllister's contention that "violations on the project site exist and must be fully investigated and remedied prior to project approval." The resolution includes this response to that contention: "Staff finds that no violation has been recorded for the property under County jurisdiction. Any violation associated with the property would be related to the original, abandoned, 1977 CC [Coastal Commission] permit. CC staff has been notified so as to recommend any remedial actions required at the site to correct a purported violation. At the receipt of this report, CC staff is expected to respond to the proposal during the appeal period."

In short, McAllister's assertion that there was an existing violation of Chapter 20.90 conflicts with judicially noticed documents, which unequivocally refute the existence of any such local code violation. "The courts . . . will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 [176 Cal.Rptr. 824].) "Thus, a pleading valid on its face may nevertheless be subject to demurrer when matters judicially noticed by the court render the complaint meritless." (*Ibid.*) This is such a case.

In any event, even assuming that McAllister's pleading had cleared this first hurdle, the remaining allegations in support of his voidness claim cannot stand.

b. *Approval as "null and void"*

As the next link in the analytic chain, McAllister argues that the existing violation renders the County's action on the project null and void under Chapter 20.90.

 Quite apart from its lack of a factual premise, this allegation must be disregarded as a bare legal conclusion. As the California Supreme Court has said in the context of complaints against administrative agencies: "Allegations that the acts of a commission or board were 'arbitrary, capricious, fraudulent, wrongful and unlawful,' like other adjectival descriptions of such proceedings, constitute mere conclusions of law which are not to be deemed admitted by a demurrer." (*Faulkner v. Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329 [253 P.2d 659].) McAllister's characterization of the County's action as "legally null and void" suffers from the same defect.

Urging against that conclusion, McAllister cites the venerable case of *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313]. In that case, the California Supreme Court said this: "The sustaining of the demurrer to the second cause of action cannot be justified on the ground that the allegation that the housing accommodations were 'publicly assisted' was merely a conclusion of law. The distinction between conclusions of law and ultimate facts is not at all clear and involves at most a matter of degree." (*Id.* at p. 473.) The court further explained: "In permitting allegations to be made in general terms the courts have said that the particularity of pleading required depends upon the extent to which the defendant in fairness needs detailed information that can be conveniently provided by the plaintiff, and that less particularity is required where the defendant may be assumed to possess knowledge of the facts at least equal, if not superior, to that possessed by the plaintiff. [Citations.] In accordance with these principles it may be alleged generally, *in the terms of the statute*, that housing accommodations are 'publicly assisted.' " (*Id.* at p. 474, italics added.)

A critical distinction exists between that case and this one. The key term in the pleading at issue in *Burks*—"publicly assisted" housing accommodation—came clothed in a detailed statutory definition. (*Burks v. Poppy Construction Co., supra*, 57 Cal.2d at p. 471; see *id.* at p. 472, citing Health & Saf. Code, former § 35710, subd. 3.) The same is not true here. The pivotal allegation here—that the action was "null and void"—does not enjoy an accepted meaning, under either statutory or decisional law, which would serve to give it a concrete factual dimension and thus to elevate it from the status of bare legal conclusion.

Moreover, even as a conclusion of law, the claim is fallacious. As noted above, Chapter 20.90 provides that any permit, "if issued in conflict with the provisions of *this title*, shall be null and void." (Monterey County Code, § 20.90.010, italics added.) As the judicially noticed documents demonstrate, however, there is no violation of "this title" in this case, only a decades-old violation of a prior permit, which was issued more than a decade before the Coastal Commission's 1988 certification of the County's LCP.

For all these reasons, we need not accept as true McAllister's contention that the County's action was a legal nullity.

c. *Lack of jurisdiction*

The third and final link in McAllister's progression of arguments is his contention that both "the County and the Coastal Commission were without jurisdiction to take any action on the Project" since the County's approval was a legal nullity.

Once again, this assertion is nothing more than an unvarnished legal conclusion. In order "to state a cause of action warranting judicial interference with the official acts of [agency] defendants, [plaintiffs] must allege much more than mere conclusions of law; they must aver the specific facts from which the conclusions entitling them to relief would follow." (*Faulkner v. Cal. Toll Bridge Authority, supra*, 40 Cal.2d at p. 330.) Here no such facts have been stated that are supportable in light of the judicially noticed documents before us.

Moreover, as with his second argument, the conclusion of law that McAllister draws on this point is itself erroneous. As legal authority for his claim that voidness necessarily divests jurisdiction, McAllister relies on the case of *City of Cupertino v. City of San Jose* (1960) 186 Cal.App.2d 29 [8 Cal.Rptr. 525]. That case involved competing annexation proceedings. (*Id.* at p. 30.) In such situations, the court explained, "it has been made clear that 'the first proceeding in point of time excludes the jurisdiction of the later one' [citation] and that the second proceeding is, in such situation 'an absolute nullity and [is] void' [citation]." (*Id.* at p. 32.) "Since an annexation proceeding which is 'null and void' is so from the very beginning, and is generally ineffectual for all purposes, it does not bar a second proceeding by the same annexing city [citation]." (*Ibid.*)

Patently, the situation presented in *City of Cupertino* bears no relation to our case. In this case, unlike that one, no competing proceeding barred the County's jurisdiction. (Cf. *City of Cupertino v. City of San Jose, supra*, 186 Cal.App.2d at pp. 31–32; *Andrisani v. Saugus Colony Limited* (1992) 8

Cal.App.4th 517, 524 [10 Cal.Rptr.2d 444] ["trial court clearly had jurisdiction to vacate its void orders, made without jurisdiction, while the appeal was still pending"].) Nor was there a lack of fundamental jurisdiction to approve the project. (Cf. *County of Alpine v. County of Tuolumne, supra,* 49 Cal.2d at p. 798; *Buckley v. California Coastal Com., supra,* 68 Cal.App.4th at p. 190.)

As stated above in connection with McAllister's second argument, we need not accept his characterization of the County's action as "null and void." But even if we were to concede that premise, it would not follow ipso facto that the County lacked fundamental jurisdiction to act. One example of the impact of "voidness" on jurisdiction, offered by way of analogy, is when a trial judge has been disqualified. (Code Civ. Proc., §§ 170, 170.6.) In such cases, it has been argued, "the challenged judge is without jurisdiction to conduct any further proceedings in the cause, and his subsequent orders are null and void." (*Andrisani v. Saugus Colony Limited, supra,* 8 Cal.App.4th at p. 525 [stating the party's contention].) "Although the cases frequently refer to the subsequent orders or judgment of a disqualified judge as absolutely void for lack of jurisdiction . . . , it is clear that . . . the actions of a disqualified judge are not void in any fundamental sense but at most voidable if properly raised by an interested party." (*In re Christian J.* (1984) 155 Cal.App.3d 276, 280 [202 Cal.Rptr. 54], citations omitted.) Thus, even a claim of underlying "voidness" does not inexorably rob an adjudicatory body of its jurisdiction.

To sum up, McAllister has not stated a cause of action with respect to his voidness claim. His allegation that the County's consideration of real parties in interests' application violated Chapter 20.90 is directly contradicted by facts subject to judicial notice. (*Del E. Webb Corp. v. Structural Materials Co., supra,* 123 Cal.App.3d at p. 604.) His other two assertions—that the County's action was null and void and that the County and the Coastal Commission therefore lacked fundamental jurisdiction to act—must be disregarded as baseless and erroneous legal conclusions. (*Long Beach Equities, Inc. v. County of Ventura, supra,* 231 Cal.App.3d at p. 1024.)

### C. *McAllister's Pleading Did Not State a Cause of Action Under CEQA*

McAllister's remaining theory in support of the validity of his first cause of action relies on CEQA. He asserts: "The County Defendants failed to comply with CEQA" in various respects, including failure to prepare an EIR for the project, reliance on a flawed initial study, and adoption of inadequate mitigation measures.

As we now explain, in the procedural context of this case, those allegations do not support a claim against the County.

1. *The County's CEQA determinations have been superseded by the Coastal Commission's review.*

■ With the Coastal Commission's decision to accept the administrative appeal, the County's CEQA determinations were converted into intermediate decisions, lacking in finality. "When, in the course of hearing that appeal, the Commission found a 'substantial issue,' it then heard the entire permit application de novo. The scope of that hearing decisively affects the status of the [County] and the Commission: 'A hearing *de novo* literally means a new hearing, or a hearing the second time. [Citation.] Such a hearing contemplates an entire trial of the controversial matter in the same manner in which the same was originally heard. It is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held. . . . The decision therein . . . takes the place of and completely nullifies the former determination of the matter.' " (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569, quoting *Collier & Wallis, Ltd. v. Astor* (1937) 9 Cal.2d 202, 205 [70 P.2d 171].) "Once the Commission conducted its de novo examination, there was no longer a decision by the [County] to review." (*Ibid.*)

The County's CEQA decisions thus have been superseded by the Coastal Commission's environmental review. "The Commission's findings that the [project] complied with CEQA superseded equivalent findings by the [county board of supervisors] [citations] in precisely the same manner that the Board's decision superseded that of the planning commission." (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 570.) As a result, McAllister no longer has any CEQA claims against the County, which is "no longer plaintiff's adversarial opponent." (88 Cal.App.4th at p. 570.)

2. *The County's CEQA determinations are no longer subject to judicial review.*

As McAllister correctly observes, for purposes of environmental review of the project challenged here, the County is the lead agency under CEQA, while the Coastal Commission is a responsible agency. (See Guidelines, § 15050, subds. (b)(1), (c).) As he also points out, "CEQA mandates a lead agency to conduct a thorough review of the project in question even though additional review might later be undertaken by other agencies with jurisdiction over specific resources." (*Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908, 921 [13 Cal.Rptr.2d 117] (*Save San Francisco Bay*).)

From that premise, McAllister argues: "As a lead agency, the County's failure to comply with CEQA . . . is subject to challenge under Code of Civil Procedure section 1094.5."

We cannot agree. True, the County was the lead agency here. As explained above, however, its CEQA determination was not final for purposes of administrative mandamus. That fact is one of several that distinguish our case from *Save San Francisco Bay.* (See *Save San Francisco Bay, supra,* 10 Cal.App.4th at p. 918.) A second distinction, which proceeds from the first, is that the agencies involved in *Save San Francisco Bay* undertook environmental review under different statutory schemes, each with a slightly different focus, rather than engaging in sequential review in a vertical process under CEQA. (10 Cal.App.4th at pp. 917, 918.)

As the *San Francisco Bay* court explained: "The administrative review of the aquarium project took over four years and was conducted by many agencies, including the City's planning commission, planning department, port commission, art commission and board of supervisors, the Regional Water Quality Control Board, the Bay Area Quality Management District, the United States Army Corps of Engineers and BCDC [San Francisco Bay Conservation and Development Commission]. The project raised numerous complex issues and generated strong public interest. Nevertheless, approval was eventually forthcoming from every agency involved, each having a slightly different mission and each being subject to its own rules and regulations." (*Save San Francisco Bay, supra,* 10 Cal.App.4th at p. 917.) "After the planning commission certified the final EIR and approved the project, BCDC formally accepted the project for review." (*Id.* at p. 918, fn. omitted.) However, that agency's review was not pursuant to CEQA; rather, it was under an entirely different statutory scheme, the McAteer-Petris Act or MPA. (10 Cal.App.4th at pp. 915, 918; see Gov. Code, § 66600 et seq.) "Although it had participated in the preparation of the EIR, BCDC's central role in the review process was to review the project for conformity with the provisions of the MPA" and specific area plans. (*Save San Francisco Bay,* at p. 918.) As the court pointed out, those two statutory schemes— CEQA and the MPA—"differ in many significant respects." (10 Cal.App.4th at p. 923.)

In this case, by contrast, the Coastal Commission did not undertake its environmental review pursuant to an entirely separate statutory scheme with a distinct focus. To the contrary, as CEQA and its accompanying Guidelines recognize, Coastal Commission review is a *substitute* for an EIR. (See § 21080.5, subds. (a), (e)(1); Guidelines, §§ 15002, subd. (*l*), 15251,

subds. (c), (f).)[9] Its review is "the functional equivalent of the EIR process." (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569.) In this case, Coastal Commission review was the final step in a sequential process of CEQA proceedings, which started with the County's planning commission. That final step is the only one appropriate for judicial review. (Code Civ. Proc., § 1094.5.) Under the circumstances presented here, the CEQA determination made by the County's board of supervisors is no more final than that made earlier by its planning commission. Both are merely intermediate determinations, and neither is a proper subject for judicial review.

In short, nothing in *Save San Francisco Bay* or in the County's status as lead CEQA agency offers any basis for judicial review of the County's intermediate environmental decision.

### 3. *Policy considerations do not dictate a different result.*

Arguing against that conclusion based on policy considerations, McAllister contends that "the County's compliance with CEQA with respect to projects in the most sensitive coastal areas would be forever beyond judicial review."

We reject that argument. As provided by the Legislature, aggrieved parties may seek judicial review of a *final* environmental decision only. (Code Civ. Proc., § 1094.5.) In this case, that decision is entrusted to the Coastal Commission. (See §§ 21080.5, subd. (a), 30603.) We do not share McAllister's apparent apprehension over the Legislature's decision to give the Coastal Commission the final administrative say on sensitive coastal developments such as the one at issue here. In our view, that legislative choice is consistent with the commission's statutory charge to protect the "quality of the coastal zone environment . . . ." (§ 30001.5, subd. (a).) Nor do

[9] As the relevant portion of the statute provides, "when the regulatory program of a state agency requires a plan or other written documentation containing environmental information" that complies with the statute, "the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division if the Secretary of the Resources Agency has certified the regulatory program pursuant to this section." (§ 21080.5, subd. (a).) The Coastal Commission's regulatory program has been so certified. According to the Guidelines: "The following programs of state regulatory agencies have been certified by the Secretary for Resources as meeting the requirements of Section 21080.5: [¶] . . .[¶] . . . The regulatory program of the California Coastal Commission and the regional coastal commissions dealing with the consideration and granting of coastal development permits under the California Coastal Act of 1976, Division 20 (commencing with Section 30000) of the Public Resources Code." (Guidelines, § 15251, subd. (c).) Coastal Commission environmental review thus is among the programs that "have been certified by the Secretary of the Resources Agency as involving essentially the same consideration of environmental issues as is provided by use of EIRs and negative declarations. Certified programs are exempt from preparing EIRs and negative declarations but use other documents instead." (Guidelines, § 15002, subd. (*l*).)

we agree with McAllister that shielding the local CEQA decision from judicial review when an appeal is taken to the Coastal Commission "would provide the County with a disincentive to rigorously comply with CEQA and would leave the County unaccountable to the public for its CEQA violations in this context." In the first place, as a factual matter, nothing in the record before us suggests that the County fails to rigorously comply with its obligations under CEQA. Furthermore, a cursory examination of the administrative appeal process demonstrates the fallacy of that contention as a legal argument. The Coastal Commission does not have appellate jurisdiction unless someone takes an appeal. (§ 30603.) Had no appeal been taken here, the County's CEQA determination would have been final and subject to immediate judicial review. In any given case, the County cannot know in advance whether its decision will be subject to a direct court challenge. For that reason alone, it has every incentive to comply with CEQA.

To sum up, McAllister's policy arguments are unpersuasive in the face of the legislative dictates that govern us here.

## D. *The Trial Court Did Not Err in Failing to Grant Leave to Amend*

McAllister's final appellate contention is that the trial court abused its discretion in sustaining the demurrer without leave to amend. He argues that the trial court did not give him "a fair prior opportunity to correct any substantive defect in the complaint," and thus abused its discretion. (See *Larwin-Southern California, Inc. v. JGB Investment Co.* (1979) 101 Cal.App.3d 626, 635 [162 Cal.Rptr. 52].) He asserts: "If given a fair opportunity, Dr. McAllister would be able to amend the Complaint to allege, if necessary, more facts to support a violation of CEQA, Chapter 20.90 and his legal theory that the County's approval of the Project is null and void based on the violations of the 1977 Permit."

### 1. *Policy favoring amendments*

"The trial court has discretion to allow amendments to the pleadings 'in [the] furtherance of justice.' (Code Civ. Proc., § 473, subd. (a)(1).) 'This discretion should be exercised liberally in favor of amendments . . . .' " (*Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co.* (2006) 137 Cal.App.4th 905, 916 [41 Cal.Rptr.3d 39].) Furthermore, "a plaintiff need not request leave to amend in order to preserve on appeal the issue of whether the court abused its discretion in sustaining a demurrer without leave to amend (Code Civ. Proc., § 472c) . . . ." (*Palm Springs Tennis Club v. Rangel* (1999) 73 Cal.App.4th 1, 7 [86 Cal.Rptr.2d 73].)

## 2. *Plaintiff's burden*

As the California Supreme Court explained long ago in the leading case of *Blank v. Kirwan*, when a demurrer "is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment . . . . The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318, citations omitted.) In that case, the court found that the plaintiff failed to "carry his burden of proving a reasonable possibility that the defects can be cured by amendment." (*Id.* at p. 319.)

In order to demonstrate a reasonable possibility of curing the defect in the complaint, the plaintiff must show how the complaint can be amended and how the amendment will change the pleading's legal effect. (*Palm Springs Tennis Club v. Rangel, supra*, 73 Cal.App.4th at pp. 7–8.)

## 3. *Application*

McAllister failed to carry his burden here.

As to his voidness claim, McAllister does not indicate what specific facts he could assert that might breathe life into that claim. He "has never suggested what facts [he] is prepared to allege that would cure the defect in [his] complaint." (*Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co., supra*, 137 Cal.App.4th at p. 916.) Furthermore, there is "nothing in the record that suggests" a reasonable possibility of cure, particularly given the judicially noticed documents in this record. (*Ibid.*) In this case, it is not enough to offer "essentially the same allegations but with greater specificity." (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 319.)

As to his CEQA claim, as explained above, McAllister cannot state a cause of action against the County. The proper defendant is the Coastal Commission. But due to the passage of time, it cannot now be joined as a party-defendant on McAllister's CEQA claim. (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra*, 88 Cal.App.4th at p. 570 [the plaintiff offered no "suggestion how the Commission could be joined 13 months after it had issued the permit to real parties"].)

Under these circumstances, the trial court did not abuse its discretion in sustaining the demurrer without leave to amend. (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 319; *Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co., supra*, 137 Cal.App.4th at p. 916; *Kaczorowski v. Mendocino County Bd. of Supervisors, supra*, 88 Cal.App.4th at p. 570.)

## DISPOSITION

We treat the challenged order of February 22, 2005, as a judgment of dismissal, entered nunc pro tunc, which we affirm. McAllister shall bear the costs of appeal.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.